**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROGELIO SALGADO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **13-cv-8196** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Rogelio Salgado ("Salgado" or "claimant") filed suit after defendant

Commissioner of Social Security (the "Commissioner") denied his claim for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Salgado has

filed a motion for summary judgment [13] seeking reversal of the Commissioner's

decision, and the Commissioner has filed a motion for summary judgment [21] asking

the Court to uphold the decision.  This Court has jurisdiction pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3).  For the reasons set forth below, claimant's motion is granted

and the Commissioner's motion is denied.

## I.     BACKGROUND

In 1995, Salgado suffered an injury that required amputation of his left leg, above

the knee.  (R. 33, 278).  After his injury, in the late 1990's, Salgado worked as an

assembler.  (R. 31, 33, 215).  From 2001 to December 2007, Salgado worked in his

family's grocery store.  (R. 30, 31, 33, 215).  He stopped working in December 2007.

(R. 215).

## A.    Procedural History

On March 18, 2011, Salgado filed an application for both DIB and SSI and alleged that his disability began on December 31, 2007.  (R. 169, 176).[1]  On July 1, 2011, Salgado's claim was denied, for the reason that he could still perform his prior work.  (R. 54, 58).  By July 11, 2011, Salgado requested reconsideration.  (R. 60).  On September 21, 2011, the Social Security Administration denied Salgado's request for review, again for the reason that he could still perform his prior work.  (R. 67).  On September 23, 2011, Salgado requested a hearing.  (R. 77).

On July 16, 2012, an Administrative Law Judge ("ALJ") held a hearing at which Salgado and a vocational expert testified.  (R. 25-26).  On August 30, 2012, the ALJ issued a written opinion in which she denied Salgado's request for benefits.  (R. 11-19).  Salgado filed a timely request for review.  (R. 7).  On September 27, 2013, the Appeals Council denied Salgado's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. 1-3).

## B.    Medical Evidence

### 1.    Treating Physicians

#### a.    Dr. Chiragi Shah

In February 2011, Salgado saw Chiragi Shah, M.D. ("Dr. Chiragi Shah") to have a wound near his amputation site checked.  (R. 273).  Salgado told Dr. Chiragi Shah that he had "noticed [the] wound opening up about a month" before the appointment.  (R. 273).  Dr. Chiragi Shah noted that Salgado had a "1 cm area of redness" with "open

_____

[1]  Salgado had previously applied for DIB in 1995, but his claim was denied.  (R. 183).

skin along scar" but with "[n]o active discharge." (R. 274). Dr. Chiragi Shah assessed

the problem as "mild" cellulitis and recommended that Salgado "avoid [his] prosthesis

for a few days." (R. 274). Dr. Chiragi Shah described Salgado's affect as "normal and

positive." (R. 274).

Salgado returned for a follow-up appointment with Dr. Chiragi Shah on March 15,

2011. (R. 271). Dr. Chiragi Shah noted that Salgado's "[s]tump [wa]s mildly irritated,

with redness and hypersensitive." (R. 272). Dr. Chiragi Shah found no signs of

infection. Dr. Chiragi Shah also noted that Salgado's affect was "normal and positive"

and that Salgado "denie[d] all symptoms in all systems except for HPI [history of present

illness]." (R. 271-272).

### b. Ecker Center for Mental Health

On September 1, 2011, after he appealed the initial denial of his claim for

benefits, Salgado began treatment at the Ecker Center for Mental Health. (R. 317).

There, Salgado met with Walter Pedemonte, M.D. ("Dr. Pedemonte") on multiple

occasions.

Salgado first met with Dr. Pedemonte on September 20, 2011. (R. 324). At that

appointment, Salgado told Dr. Pedemonte that he became depressed after the car

accident in 1995. He described his problem to Dr. Pedemonte as "severe anxiety" and

an inability to sleep. (R. 323). Dr. Pedemonte diagnosed Salgado with "Major

Depression" and prescribed venlafaxine (an anti-depressant) and alprazolam (an anti-

anxiety drug). (R. 324.) On October 18, 2011, Dr. Pedemonte noted that Salgado's

"mood and affect are improving" as were his "insight and judgment." (R. 329). On

January 17, 2012, Dr. Pedemonte described Salgado's affect as "depressed" and his

insight and judgment as "moderate." (R. 333). On April 17, 2012, Dr. Pedemonte described Salgado's mood and affect as "fair" and said his "prognosis is fair." (R. 338). On May 16, 2012, Dr. Pedemonte said Salgado's "mood and affect are much better." (R. 341).

In addition to seeing Dr. Pedemonte at the Ecker Center, Salgado also met with Teresa Flores, a therapist, every few weeks. (R. 326, 327, 328, 330, 331, 334, 337, 378). The therapist discussed with Salgado coping mechanisms, such as relaxation techniques, "the power of positive self-talk," and "positive visualization." (R. 327, 330, 331). The therapist also encouraged Salgado to obtain a new prosthetic device. (R. 326, 328). At one session, Salgado told his therapist that he felt he was failing his family by not bringing in money. (R. 332). At another, Salgado told his therapist that he was disappointed that his new prosthetic device did not fit him well. (R. 335).

On May 24, 2012, Salgado met with Julissa Gonzalez ("Gonzalez"), whose title at the Ecker Center was "Bilingual Intensive Case Manager." (R. 342, 377). The purpose of the meeting was "to help improve Rogelio Salgado's access to community services" in anticipation of his "disability hearing on 7/16/12." (R. 342). On June 25, 2012, Gonzalez wrote a letter on behalf of Salgado. (R. 375-377). In the letter, Gonzalez stated, "I have been asked to write this letter for Mr. Salgado in support of his need for Medicaid assistance and Social Security benefits based on his current symptoms and history of symptoms." (R. 375). In addition to describing the symptoms Salgado shared with Dr. Pedemonte and the therapist, Gonzalez also opined:

> Due to the severity of Mr. Salgado's symptomology, he is unable to
> maintain gainful employment. This is because depression, anxiety, his
> having his leg amputated, along with symptoms discussed above, truly

limit Mr. Salgado's ability to function successfully. His symptoms keep
him from being able to search for a job, interview for and/or maintain a job.

* * *

Mr. Salgado is unable to look for employment opportunities, out of
financial necessity; he is unlikely to find and maintain successful
employment given the limitations created by the above-described
symptoms. Given his history of partially successful attempts at remission,
his history of ongoing depression, anxiety, difficulty with daily living
activities such as self-care, vocational, problem-solving, social network,
and coping skills, and because his diagnoses represent chronic,
treatment-resistant, and incurable conditions, it is unlikely that his
condition will show adequate improvement in the foreseeable future.

(R. 376-377). Eventually, Dr. Pedemonte also signed the letter. (R. 381-383).

### c. Adventist Hinsdale Hospital

On February 20, 2012, Salgado presented at Adventist Hinsdale Hospital with

chest pains. (R. 346). The admission notes state, "Patient's sister acts as a historian.

The patient woke up feeling light-headed in the am yesterday[;] that resolved shortly

after getting up. The patient then proceeded to cook a large dinner for multiple family

members. The patient then developed a sharp [pain] in the left side of the chest and

throbbing in the left throat." (R. 346). The hospital performed a number of tests to rule

out heart attack and heart disease. (R. 349, 352, 355, 357, 361, 364, 372).

Separately, but at the same hospital system, Salgado saw Dr. Jaime Martinez,

M.D. ("Dr. Martinez") for anxiety, beginning on March 1, 2012. (R. 411.) At that

appointment, Salgado told Dr. Martinez that, for the past two years, he had suffered

anxiety, depression, diminished interest, feelings of guilt, poor concentration, fatigue

and sleep disturbance. (R. 411). Dr. Martinez concluded that Salgado suffered

"[m]oderately severe depression." (R. 412). Dr. Martinez asked Salgado to begin

taking Paxil (an anti-depressant) and trazadone (an anti-depressant), instead of his prior medication, because Salgado reported that the prior medication had not helped. (R. 412).

Salgado saw Dr. Martinez again on March 29, 2012. (R. 408). At that time, Salgado told Dr. Martinez that, for the last three years, he had suffered anxiety, depressed mood, fatigue, feelings of guilt, poor concentration and sluggishness. (R. 408). Although Dr. Martinez described Salgado's affect as "normal," he increased Salgado's dosages of Paxil and trazadone. (R. 409).

On April 16, 2012, Salgado saw Dr. Martinez again. (R. 405). This time, Salgado told Dr. Martinez that he had experienced his symptoms–anxiety, fearful thoughts, traumatic memories, depressed mood, fatigue–for four years. (R. 405). Dr. Martinez noted that Salgado "has the symptoms of a major depressive episode." (R. 405).

### d.     Dr. Ehsan

The record reflects that Salgado visited the offices of Dr. Jawed Ehsan, M.D. ("Dr. Ehsan") on several occasions, including on July 19, 2011 for anxiety; on July 26, 2011 for a follow-up; on August 2, 2011 for headaches; on August 23, 2011 for a check up; on September 20, 2011 for a follow-up; and on January 11, 2012 for anxiety. (R. 384, 385, 386, 387, 389). Dr Ehsan's notes are mostly illegible, but it is clear he sent Salgado for a bone density test and for a Vitamin D deficiency test. (R. 391, 396).

### e.     Scheck & Siress

In the fall of 2011, Salgado sought help from Scheck & Siress for a new prosthetic device. Over the course of five months (from September 2011 to February 2012), Salgado had multiple appointments for the fitting and adjustment of a new prosthetic device. (R. 399-403). At his first appointment, Salgado told the staff at Scheck & Siress that he needed a new device to navigate stairs at his home (four steps at the threshold and twelve inside) and because he wanted to get "back to playing sport[s]" and seeking employment. (R. 399).

Over the course of several appointments, the staff noted that Salgado could "ambulate" on "parallel bars" and "looked good" using the new device. (R. 400, 401, 402). At each appointment the device was adjusted slightly. On November 4, 2011, the staff reduced the size of the socket. (R. 400). On November 23, 2011, the staff scheduled Salgado for another appointment to add a flexible inner liner. (R. 400). On December 8, 2011, the staff noted that the fit "appeared optimal in 3ply [socks]." (R. 401). The staff also noted that Salgado "expressed comfort" and his skin "appeared free of irritation/redness." (R. 401). Similarly, on December 14, 2011, the staff noted Salgado "ambulated several times in the parallel bars and expressed comfort. Skin looked good following walking trials." (R. 402). On December 28, 2011, the staff noted Salgado "is currently ambulating with [a] single cane." (R. 402). When Salgado "complained that [the] calf section was too large and that [the] socket rotated externally during sitting," the staff rotated the knee section and reduced the calf section. (R. 402). Finally, the staff made a few minor adjustments on February 7, 2012, which made Salgado "more comfortable." (R. 403).

### 2. Consulting Physicians

### a.  Dr. Karri

The Bureau of Disability Determination sent Salgado for several consultations. On June 14, 2011 (before Salgado's appeal), Salgado attended an internal medicine consultation with Roopa Karri, M.D. ("Dr. Karri"), with whom Salgado spent 42 minutes. (R. 275, 278).  Salgado reported to Dr. Karri that he had stopped using his prosthetic leg about six months prior, because he was experiencing pain in his lower back and bleeding and infection on his leg.  (R. 275-276).  Dr. Karri found "[n]o evidence of rash or neoplasia" and "no ulcers."  (R. 276).  Dr. Karri noted "mild hyperpigmentation near the stump."  (R. 276).

Dr. Karri also commented on Salgado's size and mobility.  Dr. Karri noted that Salgado is obese at 5'4" and 180 pounds.  (R. 276).  Dr. Karri stated that Salgado "was able to get on and off the exam table" but supports his back with his hands when he sits.  (R. 277).  Dr. Karri noted that Salgado "needs crutches to ambulate" and cannot "tandem gait."  (R. 277).  Dr. Karri found Salgado's range of motion to be normal in his shoulders, elbows, wrists, hips, cervical spine, right knee and right ankle.  (R. 277).  Dr. Karri could not, however, test the range of motion in Salgado's lumbar spine, "because the claimant was afraid of falling."  (R. 277).

Dr. Karri stated the following about her mental status examination of Salgado:

> The claimant was alert and oriented in all 3 spheres.  Memory, appearance, behavior and ability to relate during the examination were normal.  The claimant was appropriate, polite, pleasant and cooperative and able to relate a clear, concise, coherent medical history without apparent cognitive difficulties.  The affect was normal.  There were no signs of depression, agitation, irritability or anxiety.  The hygiene and grooming were good.  Overall effort and cooperation were excellent.

(R. 277).  (This examination occurred before claimant appealed and added anxiety to his list of ailments.)

Dr. Karri's impression was that Salgado had two problems:  left above-knee amputation and obesity.  (R. 278).

### b.    Drs. Bone and Kenney

On June 27, 2011, Dr. Ernst Bone ("Dr. Bone") conducted a physical residual functional capacity evaluation ("RFC").  (R. 280).  Dr. Bone noted that Salgado had used a prosthetic leg after his amputation and that he had been treated for ulcers on his stump, which appeared to have healed.  (R. 281).  Dr. Bone also noted that Salgado had experienced back pain but had not allowed a range of motion test, due to his fear of falling.  (R. 281).

Based on his review, Dr. Bone concluded that Salgado could lift ten pounds frequently and 20 pounds occasionally.  (R. 281).  Dr. Bone thought Salgado could stand for up to two hours of a normal work day and could sit for about six.  (R. 281).  Dr. Bone concluded that Salgado could occasionally stoop, balance, kneel and crawl and could frequently climb stairs, but Dr. Bone said Salgado should never climb ladders or ropes.  (R. 282).  Dr. Bone stated that Salgado should avoid hazards, such as heights and machinery.  (R. 284).  Finally, Dr. Bone concluded that Salgado was only partially credible, because "he suggests his condition is worse than the [objective] evidence indicates."  (R. 286).

After Salgado appealed, the Bureau of Disability Determination asked Dr. Charles Kenney, M.D. ("Dr. Kenney") to review Dr. Bone's RFC assessment.  Dr. Kenney noted that, in Salgado's appeal, Salgado did not allege worsening physical

conditions; rather, he added depression.  (R. 316).  Dr. Kenney noted that depression

would be evaluated separately from his evaluation.  (R. 316).  Dr. Kenney agreed with

Dr. Bone's RFC.  (R. 315).  He explained that Salgado's stump had healed, such that

Salgado should be able to use a prosthetic device.  (R. 316).  Thus, Dr. Kenney further

stated that Salgado did not fall into the category of being unable to use the prosthetic

device for a period of twelve months.  (R. 316).

### c.      Dr. NieKamp

After Salgado appealed and added anxiety to his list of problems, he was sent for

a mental status evaluation.  (R. 289).  On August 9, 2011, Salgado met with David

NieKamp, Psy.D. ("Dr. NieKamp") for about 45 minutes.  (R. 289).

Dr. NieKamp noted that Salgado reported that he is depressed and anxious.  (R.

290).  Salgado told Dr. NieKamp he experienced poor sleep, recurrent nightmares

(about his accident), phantom pain, panic attacks, poor concentration and feelings of

hopelessness.  (R. 290).  Dr. NieKamp found no signs of thought disorder, psychosis,

paranoia or delusions.  (R. 290).  Dr. NieKamp found that Salgado's cognitive function

and memory were "intact."  (R. 291).  Dr. NieKamp stated that the symptoms Salgado

described "match criteria for moderate to severe levels of depression and anxiety with

PTSD features."  (R. 292).

In sum, Dr. NieKamp described his clinical impression as "[a]nxiety: severe with

PTSD features" and "[d]epression: moderate to severe."  (R. 292).

### d.      Dr. Hudspeth

On September 19, 2011, Dr. Lionel Hudspeth, Psy.D. ("Dr. Hudspeth") conducted a psychiatric review. (R. 300). Dr. Hudspeth concluded that Salgado had a "not severe" impairment in the category of "affective disorders." (R. 300). Specifically, Dr. Hudspeth noted that Salgado has "depressive and anxiety symptoms" secondary "to amputation in 1995." (R. 303). Dr. Hudspeth considered Salgado's functional limitations and concluded that Salgado was mildly restricted with respect to daily living, maintaining social functioning and maintaining concentration, persistence or pace. (R. 310). Dr. Hudspeth noted that Salgado: (1) had "no history of any mental health treatment" or of taking any related medications; and (2) was "not currently receiving any mental health services or treatment." (R. 312). Dr. Hudspeth noted that the record contained evidence of no episodes of decompensation. (R. 310).

### e.  Dr. Mahesh Shah

The Bureau of Disability Determination Services also sent Salgado for an internal medicine consultation with Dr. Mahesh Shah, M.D. ("Dr. Mahesh Shah") on August 13, 2011. (R. 294). Dr. Mahesh Shah spent thirty minutes with Salgado. (R. 294).

Dr. Mahesh Shah noted that Salgado walked into his office using crutches. (R. 295). Although Salgado had difficulty climbing onto the examination table, Salgado moved from sitting to supine and back to sitting with no problems. (R. 295). Dr. Mahesh Shah noted that Salgado's skin texture was "normal," without rashes or lesions. (R. 295). He also specifically noted that Salgado's stump was "healed." (R. 296, 297).

Dr. Mahesh Shah's notes reflect that Salgado experienced "marked tenderness in the lumbar region." (R. 296). Dr. Mahesh Shah ordered an x-ray of Salgado's back

and diagnosed "grade 2 spondylolisthesis of L5 over S1." (R. 299). Finally, Dr. Mahesh Shah noted Salgado's "anxiety and panic attacks." (R. 296).

Dr. Mahesh Shah summed up his clinical impression as four problems: (1) "[s]tatus post above-the-knee amputation of the left leg. The stump is healed"; (2) low back pain; (3) obesity; and (4) "[a]nxiety and panic attacks." (R. 297).

### C. Claimant's Testimony

After Salgado applied for benefits, he filled out function reports describing his abilities. (R. 200, 231). In his March 13, 2011 function report, Salgado reported that his life changed when his leg was amputated in 1995, because he had to begin depending on other people for help. (R. 200). With respect to his daily life, Salgado stated that he accompanies his wife shopping but usually waits in the car. (R. 203). Salgado relies on other people to prepare his food. (R. 201). Salgado must sit when he shaves and bathes. (R. 201). Salgado stated that he "tr[ies] to help with small chores at home." (R. 201). Salgado reported that he uses an artificial limb, a cane, crutches, and a wheel chair on a daily basis. (R. 206).

When Salgado filled out a disability report for his appeal, he added anxiety and trouble sleeping to his list of ailments. (R. 224). He said he had experienced anxiety and trouble sleeping since March 2011. (R. 224). On August 29, 2011 (also in connection with his appeal), Salgado filled out a second function report. (R. 240). This time, Salgado stated, "I don't want to live anymore. I feel useless and it frustrates me to depend on someone else." (R. 232). He stated that he "rarely" goes outside, because he feels "depressed." (R. 234). He stated that he feels insecure and is afraid to be alone. (R. 237). He stated that he cannot shop, because it is too tiring. (R. 234).

Finally, he stated that he uses crutches and a wheel chair (but not a cane or an artificial limb, as he had stated in his March 2011 function report) to walk. (R. 237). In his next disability report (which is undated), Salgado stated that he began treatment for anxiety and depression in August 2011. (R. 257).

In addition to his function reports, Salgado testified at the July 16, 2012 hearing before the ALJ with the assistance of a Spanish-language interpreter. At the time, Salgado was 45 years old and had completed the twelfth grade in Mexico (before later becoming a citizen of the United States). (R. 30, 176). Salgado weighed between 180 and 190 pounds and stood five feet, four inches tall. (R. 30).

In 1995, Salgado's leg was amputated. (R. 33). He testified that he used a prosthetic leg for a year or two and then stopped, because it caused him pain. (R. 33-34). Specifically, Salgado testified that when he wore the prosthetic device, it pulled at his skin and sometimes caused bleeding. (R. 34). A few months before the hearing, Salgado was fitted for a new prosthetic device. (R. 35). Salgado testified that even with the new device, he has the "same" problem as with the old, in that the "skin opens." (R. 35). Salgado told the ALJ, "if Your Honor needs to look further here you can notice it is–it can be seen how the skin stretches and peels." (R. 35). The ALJ stated, "For the record, the claimant has shown where he has a sensitive area on the remaining portion of his leg." (R. 35). The ALJ asked Salgado whether he had returned to have the prosthetic device adjusted. (R. 35). Salgado testified that "there's no[t] much else they can do." (R. 35). Salgado then testified that he uses crutches all the time, as he has since his amputation. (R. 36). Salgado can stand for five or ten minutes with his

crutches. (R. 43). He did not know how far he could walk with crutches, because, generally, he does not walk. (R. 43).

Salgado also testified about his work history. Salgado testified that he had not worked since 2007, when he stopped working at the grocery store he and his wife owned and operated. (R. 30-31). Salgado's role at the store was to check groceries and accept the customers' payment. (R. 32). Salgado did not stock shelves or work at the store alone. (R. 32). Salgado testified that he stopped working at the store in 2007, because he "started to feel worse." (R. 31). He said he "did not care about anything anymore." (R. 31). When the ALJ asked Salgado whether it was the amputation problem or the emotional problem that caused him to stop working, Salgado testified, "At this moment, I do not know." (R. 36). He said, "I feel a very profound emptiness within me. Nighttimes I cannot sleep and daytimes I only want to be lying down, sitting down. I do not want to go outside." (R. 36).

Before Salgado worked at the store, Salgado worked at Machca Enterprises, where he assembled cables while sitting down. (R. 33). Salgado continued to work at Machca Enterprises until the plant closed. (R. 33).

On an average day, Salgado gets up, and his wife makes him breakfast. (R. 39). Salgado spends the rest of the day on the couch or in bed. (R. 39). He does not do household chores or exercise. (R. 39). He does not shop for groceries, but sometimes he accompanies his wife to the store. (R. 40, 41). In addition, Salgado rides along when his wife takes their daughter to school. (R. 40). Salgado can drive, although not long distances, because it hurts his neck and back. (R. 41). Salgado testified that he does not cook and that the reference in his medical records to him cooking was an

error.  (R. 41).  Salgado attends church, sometimes weekly, and socializes with family.

(R. 42).

Salgado also testified about his depression therapy.  He testified that his therapy

was "helping [him] to get rid of the bad thoughts that sometimes come into [his] head

suddenly."  (R 37).  He said his medications make him feel less depressed, although he

occasionally suffers side effects, such as dry mouth, headaches or the inability to sleep.

(R. 37-38).

### D.     Vocational Expert's Testimony

Vocational expert Thomas Gusloff ("Gusloff" or the "VE") also testified at the

hearing before the ALJ.  The VE testified that claimant had previously performed two

jobs at the "substantial gainful employment" level: small product assembler (which

claimant performed at the sedentary level) and cashier checker (which claimant

performed at a level between sedentary and light).  (R. 44).

The ALJ asked the VE the following hypothetical question and received the

following answer:

> Q:     Please assume a person who is 45 years old, has a high school
> education attained in Mexico, and a limited ability to communicate
> in English.  Please further assume this individual has the work
> history you've described.  And assume this individual is capable of
> performing work at the sedentary exertional level.  However this
> person cannot climb ladders, ropes or scaffolds.  This person
> cannot kneel or crawl.  This person can frequently climb ramps and
> stairs and can occasionally balance and stoop.  This person needs
> to avoid unprotected heights and dangerous moving machinery.
> This person can understand, remember and carry out simple,
> unskilled, repetitive work with only occasional interaction with the
> general public.  No limitations for co-workers or supervisors.  Based
> on that hypothetical would this individual be able to perform his past
> work?

A:       Based on that hypothetical the work of the assembler small product as he performed it at the sedentary level would be a–would fit the hypothetical.

(R. 45).  The ALJ also asked whether the same person could do the same job if he needed crutches to walk.  (R. 46).  The VE answered that "crutches would not interfere with a sedentary assembly position."  (R. 46).  The ALJ asked whether his answer would change if the hypothetical individual could not balance, stoop or crouch.  (R. 46).  The VE testified that his answer would not change, because the position would not require balancing, stooping or crouching.  (R. 46).  The ALJ asked whether the same individual could perform the job if he needed to leave the work station every hour for five minutes.  (R. 45).  The VE answered in the negative.  (R. 46).  Likewise, when asked whether the person could be off task 15% of the day or miss more than two days per month of work, the VE testified that the person would not be able to hold the position.  (R. 47).  Finally, the VE stated that his testimony was consistent with the DOT, i.e., the Dictionary of Occupational Titles.  (R. 47).

## II.    LEGAL ANALYSIS

### A.    Standard of Review

Where, as here, the Appeals Council denies review, the ALJ's ruling is the Social Security Commissioner's final decision.  20 C.F.R. § 404.981; *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).  We reverse the decision of the ALJ only if it is not supported by substantial evidence, which means evidence that "a reasonable mind might accept as adequate to support a conclusion."  *Minnick*, 775 F.3d at 935.  In doing so, we will not reweigh evidence or substitute our own judgment for that of the ALJ.  *Id.*

In essence, what we are looking for is a "logical bridge" from the evidence to the conclusion. *Id.* In addition, we defer to the credibility determination of the ALJ (who has met the claimant) unless the credibility finding is "patently wrong." *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015). A credibility finding is patently wrong when the reasons "are contradicted by the objective evidence." *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008).

## B.    Analysis under the Social Security Act

To be entitled to benefits, a claimant must be disabled within the meaning of the Social Security Act (the "Act"). A person is disabled under the Act if he has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When determining whether a claimant is disabled, an ALJ follows the five-step analysis outlined at 20 C.F.R. § 416.920(a)(4). Specifically, the ALJ considers:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairments meet or equal one of the impairments listed by the [Commissioner], see 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform [his] past relevant work; and (5) whether the claimant is capable of performing work in the national economy.

*Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citation omitted). The claimant has the burden of proof with respect to the first four steps. *Id.* At step five, the burden shifts to the Commissioner. *Id.* at 886.

In this case, the ALJ applied the five-step analysis.  At step one, the ALJ concluded that claimant had not engaged in substantial gainful employment since the disability onset date of December 31, 2007.  (R. 13).  At step two, the ALJ concluded that claimant suffers the following severe impairments:  status post above-the-knee amputation of the left leg; degenerative disc disease of the lumbar spine; obesity; depression and anxiety.  (R. 13).  At step three, the ALJ concluded that claimant does not have an impairment or combination of impairments that meets or equals a listed impairment.  (R. 14).  Next, the ALJ determined that claimant has the RFC to perform sedentary work consisting of simple, unskilled, repetitive tasks with only occasional contact with the public.  (R. 15).  In addition, the ALJ found that claimant could never climb, kneel or crawl; could only occasionally balance or stoop; could frequently climb stairs; and should always avoid hazards, such as heights and machinery.  (R. 15).  Based on that RFC, the ALJ concluded, at step four, that claimant is capable of performing his past relevant work as a small products assembler.  (R. 18).  Accordingly, the ALJ concluded that claimant was not under a disability, as that term is defined in the Social Security Act, from December 31, 2007 through the date of the decision.  (R. 18).

Claimant now argues that the ALJ erred in her step three listing determination, failed to properly assess his RFC, and erred in the hypothetical questions posed to the VE.  We address each issue in turn below.

**C.      The ALJ's Analysis**

**1.       The ALJ did not err at step three.**

Claimant takes issue with the ALJ's conclusion that he does not have an impairment that meets or equals the listed impairments. At this step, the claimant has the burden of proof. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

First, claimant argues that the ALJ erred in concluding that he does not meet listing 1.05B. That listing requires amputation of "[o]ne or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 101.00B2b, which have lasted or are expected to last 12 months." 20 CFR Part 404 Subpt. P, App. 1 at 101.05B. The ALJ concluded that claimant did not meet the listing because she "did not find evidence of stump complications resulting in medical inability to use a prosthetic device to ambulate effectively." (R. 14). The ALJ went on to cite evidence that claimant's stump had healed. (R. 16). The ALJ also relied on evidence that Salgado obtained a new prosthetic device in the fall of 2011. (R. 16). The ALJ noted evidence that Salgado had had several adjustments made to his new device and that, according to the staff that adjusted the device, Salgado was, by December 2011, ambulating with a single cane. (R. 16, 402). This convinced the ALJ that, "with adjustments to his prosthesis for fit, the claimant has demonstrated the ability to use it. His failure to do so in the absence of complications is more a matter of choice than a medical inability to use the prosthesis." (R. 16).

Claimant argues that the ALJ failed to consider "evidence that plaintiff could not use, and for years had not used, a prosthetic device because it did not function properly." (Claimant's Brief at 6). Claimant's own statements, however, are to the contrary. At his June 14, 2011 appointment with Dr. Karri, Salgado told Dr. Karri he had

stopped using his prosthetic device six months earlier due to bleeding on his stump.  (R. 275-276).  This is consistent with Salgado's statement to his treating physician, Dr. Chiragi Shah, to whom Salgado stated at his February 2011 appointment that he "noticed [the] wound opening up about a month" before.  (R. 273).  That wound, however, did not last for a period of time greater than a year.  Dr. Karri, in June 2011, and Dr. Mahesh Shah, in August 2011, found that Salgado's skin was normal (R. 276, 295), and a number of health-care professionals noted that the stump was healed.  (R. 296, 297, 402).  Furthermore, as the ALJ noted, Salgado obtained a new prosthetic device in the fall of 2011.  (R. 399-402).  Claimant makes much of the fact that the new device, at one point, was too large and, at another point, caused pressure.  But this was during the process in which the device was being adjusted to fit claimant properly.  (R. 400-402).  By the end of the adjustment period, the staff noted that Salgado "expressed comfort" with the device and was "currently ambulating with [a] single cane."  (R. 401, 402).  The ALJ's analysis was supported by substantial evidence.  Furthermore, claimant has not met his burden of showing he met listing 1.05B, so any errors in the ALJ's analysis were harmless.

Next, the ALJ considered whether Salgado's mental impairments met or equaled the criteria for listings 12.04 (for mood disorders) and 12.06 (for anxiety disorders).  Claimant argues that the ALJ failed to utilize the "special technique" in assessing whether claimant has an impairment that meets or equals the listings.

Under the special technique, the ALJ first must determine whether the claimant has a "medically determinable mental impairment."  *Craft*, 539 F.3d at 674.  If so, the ALJ must "rate the degree of functional limitation in four broad areas: activities of daily

-20-

living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* These functions are called the "B Criteria." *Id.*

We agree with the Commissioner that the ALJ followed the special technique. First, the ALJ concluded that Salgado suffers anxiety and depression. (R. 13). Next, the ALJ mentioned the B criteria and explained her conclusion that "claimant has no more than moderate limitation in any of the functional domains as a result of his mental impairments." (R. 14). As support, the ALJ noted the agency consultant's opinion (which was that Salgado was only mildly restricted with respect to daily activities, maintaining social function, and maintaining concentration, persistence or pace) and the fact that claimant's treatment records were limited (he had only begun seeking treatment for his mental impairments in the fall of 2011). (R. 14). The ALJ also noted that claimant can drive a car, manage money, attend church services and follow instructions. (R. 14). Perhaps the ALJ could have been more verbose on this point, but we have no trouble following her logical bridge. Furthermore, we note that claimant has the burden of proof at this step, and he has not argued, let alone pointed to supporting record evidence, that he met or equaled the listing criteria. Without such evidence, any imperfections in the ALJ's explanation are harmless.

## 2. The ALJ erred when assessing claimant's RFC.

Claimant also argues that the ALJ erred in evaluating Salgado's RFC. Claimant argues that the ALJ did not consider all of his impairments and that the ALJ improperly rejected the opinion of a case manager at the Ecker Center.

"When determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'" *Craft*,

539 F.3d at 676 (citing 20 C.F.R. Sect. 404.1545(a)(2), (b), (c)). The ALJ concluded that Salgado has the RFC to perform sedentary work that is limited to simple, unskilled, repetitive tasks with only occasional contact with the public. (R. 15). She further found that Salgado is restricted from climbing, kneeling and crawling and can only occasionally balance and stoop. (R. 15). The ALJ found that Salgado should avoid hazards, such as heights and machinery. (R. 15).

At least with respect to claimant's physical condition, we think the ALJ adequately explained her reasoning and has shown a logical bridge from the evidence to her RFC conclusion. As noted above (and we need not repeat the evidence here), the ALJ adequately explained why the evidence showed claimant does not have a medical inability to use the prosthesis. The ALJ also noted evidence that claimant lives in a two-story home, with steps leading to the entry and that claimant had actually performed work for years (as an assembler and at his grocery store) after his amputation. (R. 16). In addition to his leg amputation, the ALJ also considered claimant's obesity and back problems and noted that the record lacks evidence that those problems caused greater limitations than the RFC, a conclusion with which claimant does not take issue. (R. 16). In addition, the ALJ noted that the RFC was consistent with the opinion of the State agency's medical consultant. (R. 17). In sum, the ALJ built an adequate and logical bridge from the evidence to her RFC conclusion, as it relates to claimant's physical abilities.

With respect to claimant's mental impairment, on the other hand, we agree that the ALJ did not adequately explain her RFC conclusion, though not for all of the reasons claimant argues in his brief. Claimant first argues that the ALJ should not have rejected

the opinion of the case manager at the Ecker Center, but we disagree. The opinion to which claimant refers is the opinion written by Julissa Gonzalez, who was a Bilingual Intensive Case Manager at Ecker Center. (R. 375-377). The record contains no evidence that Gonzalez has any medical or legal training, and the record contains evidence of only one meeting between claimant and Gonzalez. (R. 342). In the letter, Gonzalez merely summarized the records of claimant's treatment at Ecker Center and then concluded that Salgado is unable to look for or maintain employment and that his condition was "incurable." (R. 376-377). The ALJ explained that Gonzalez's opinion, later signed by Dr. Pedemonte, was not entitled to weight for several reasons: (1) Gonzalez is not a psychologist or an otherwise-trained mental-health professional; (2) her only contact with claimant was in late May; and (3) her express purpose in writing the letter was to help Salgado obtain benefits, which purpose eroded her objectivity. (R. 17). We believe this was a reasonable explanation for not adopting the lay case manager's conclusion that Salgado could not work. We would add that we have no reason to think the case manager was applying the definition of "disabled" under the Act when she reached that conclusion.

The ALJ went on to explain that the case manager's other conclusion (that Salgado's impairment was incurable) was inconsistent with Dr. Pedemonte's own treatment notes. (R. 18). As the ALJ pointed out, Dr. Pedemonte's notes reflected improvement in Salgado's mental health. Salgado first saw Dr. Pedemonte on September 20, 2011, at which point Dr. Pedemonte diagnosed Salgado with severe depression and prescribed two drugs—one for anxiety and one for depression. (R. 323). By October 18, 2011, Dr. Pedemonte noted that Salgado's "mood and affect are

improving." (R. 329). On April 17, 2012, Dr. Pedemonte described Salgado's mood and affect as "fair" and his prognosis as "fair." (R. 338). On May 16, 2012, about a week before the case manager met with Salgado for what appears to be the only time, Dr. Pedemonte said Salgado's "mood and affect are much better." (R. 341). Thus, the ALJ had a valid reason for relying on Dr. Pedemonte's notes rather than on the case manager's conclusion that Salgado's condition was incurable.

Still, we fail to see the logical bridge between the evidence of claimant's mental impairment and the RFC. The Commissioner argues that the ALJ incorporated claimant's mental impairment into the RFC by limiting him to simple, unskilled, repetitive tasks. That may be the case, but we do not see an explicit bridge from the mental impairments to that restriction. *Craft*, 539 F.3d at 677-678 (finding no logical bridge between claimant's mental impairments and the term "unskilled" work). It is clear that the ALJ considered the medical evidence of claimant's mental impairments. For example, the ALJ noted that Dr. Pedemonte had diagnosed claimant with major depression. (R. 17). The ALJ also noted that Dr. Pedemonte's notes reflect that the prescribed medication improved claimant's mood and affect. (R. 17). The ALJ further considered the evidence of how the mental impairment affected claimant's ability to function. She noted that Dr. Pedemonte had described claimant's memory, attention, concentration, intelligence and judgment as moderate. (R. 17). Further, the ALJ noted that the consulting psychologist, too, found that claimant had intact cognitive function and normal thought process. So, it is clear that the ALJ considered claimant's mental impairment and how it affected his ability to function. What is not clear is how those impairments lead to the conclusion that claimant was capable of performing simple,

unskilled, repetitive tasks.  It may be a simple logical bridge, but we would like to see it.
On remand, the ALJ can correct the error.

### 3.    Hypothetical Questions

Finally, claimant argues that the hypotheticals posed to the VE did not
adequately reflect claimant's impairments.  In light of the fact that we are remanding for
additional consideration of the RFC, we need not comment on this issue other than to
note our agreement with the general proposition that the hypothetical must accurately
reflect the limitations the ALJ has found to be credible.  *Murphy v. Colvin*, 759 F.3d 811,
820 (7th Cir. 2014).

## III.    CONCLUSION

For the reasons set forth above, the Court grants claimant's motion [13] for
summary judgment and denies the Commissioner's motion [21] for summary judgment.
This case is remanded to the Social Security Administration for further proceedings
consistent with this opinion.  It is so ordered.


                              **ENTERED:**

                              _____
                              **Michael T. Mason**
                              **United States Magistrate Judge**

**Dated: August 4, 2015**